18-6169. Good morning, your honors. My name is Raymond Allred and I represent John Talley. May it please the court. We're here today because the district judge sitting in Oklahoma City granted summary judgment for Time and Sports Illustrated and in doing so determined material questions of fact based upon the standard that existed for summary judgment. He violated that standard because when you take the facts, and the rules are that when you take the facts as we presented and they have to be deemed truthful to us, those facts clearly show a number of incidences where one, the facts were not true. It's actually a fact and that is in reference to Osai Poguei. Osai Poguei was a quarterback from Lawton, Oklahoma. He was a stud, a superstar to be, and he was recruited by Oklahoma State University to come play football. John Talley is the FCA director in Stillwater. Been the FCA director in Stillwater for more than 20 years. Had actually introduced and become, and became aware and became knowledgeable of Osai Poguei when Osai was a freshman in high school because Osai was involved with FCA. John Talley's son, Saul, who is basically the same age as Osai, also became aware of Osai. In fact, Saul Talley was dating a girl in Lawton, so he would go down there and spend time with Saul. And so when it came time for, I'm sorry, Saul went to Lawton. And I'm sure this is on the record. It is, your honor. Okay. But I mean, but the history and the predicate is that when Sports Illustrated and Time published  with this big booster, John Talley, and did it for free because he was a superstar quarterback. But the reality, the truth, the truth of the facts are that he was friends with the family. He was good friends with Saul. He came and lived at John Talley's ranch, and they called it a ranch, but it was a 4.8 acre of land in Stillwater. And he comes and lives on his residence. He works. He has to provide one meal a week. But none of those facts are presented in the story. Thayer Evans is the reporter for Sports Illustrated. He's the one that interviewed Osai Pogai. And when, and it's hard to listen to Thayer Evans' interview of Osai Pogai because instead of asking open-ended questions, he's asking suggestive, leading questions. He's asking questions on top of him. He's bullying him. He's trying to put him in a corner. But if you listen through the tape, at 12 minutes on the tape, and this is at, it's at page 894 on volume four, it's clear that Osai Pogai says that he worked while he lived at John Talley's residence. But they never published anything like that in the article. So under the false lie claim- I listened to the tape, too. And in your brief, it says, the interview recording and I'm quoting, clearly states that Osai Pogai worked extremely hard in exchange for rent. I didn't see that statement, or I didn't hear that statement. Maybe I wasn't listening as closely as I should have, but I didn't hear that statement. Is that statement on the tape? That statement is not on the tape. What is on the tape is that he worked for John. And it's hard. It's really hard, because it's- At one point in the interview, Mr. Evans says, you lived there, but you never, you never worked. Then, Mr. Pogai says, I didn't, I didn't do anything like. And I think you have to look at the context of the interview as it's going on, because there Evans is saying that people are going to John Talley and they're working or they're getting overpaid, or they're showing up and they're not working, but they're getting paid. And so when you look at the context of the interview as it's going on, it creates the impression that there Evans is trying to say, well, did you go work for John Talley and get overpaid? Or did you, did you just show up and not get paid at all? And because of that, the context of how that recording goes, that's why Osai Pogai denies it. Well, okay. I mean, I'll add a little more context. Sure. Mr. Evans. I mean, you live with, by the way, there wasn't any transcript made for this case. There wasn't a complete transcript of the audio tape. We submitted the audio tape contemporaneously when we filed it. And so there's the audio tape, but there's not a complete transcript, but also Pogai's statement. All right. Mr. Evans. I mean, you live with, with John, right? I mean, what was the arrangement, Mr. Pogai? I had no arrangement. That's the thing that's throwing me off. I'm like arrangement. I didn't make, you know, any money. And see, I think that's the context too. It is. See, when you look at Thera Evans' interview, that arrangement is, oh, you can come work for me and I'll overpay you. That's what he's trying to imply when he's doing this interview. Because he's suggestive in the questions that he's asking. He's leading Pogai in the questions he's asking. So based on the context of how he's asking these questions, he's trying, he's got a narrative. He's got an agenda and he's trying to focus Osai to give him information to support the narrative. But does it matter if he has an agenda or not? It doesn't. But S. I. Pogai gives the answers that are contradictory to what you're saying. It doesn't matter whether they have an agenda or not. It does if the information that he's giving says that what you're going to publish is not true. And Osai says that he worked. And they publish in the article that he did it, that he lived there for rent-free. Well, Kip, so please help me, just point me to where he says, I did work. It's at 12 minutes on the tape. On the tape. It's right at 12 minutes, Your Honor. And it's volume, and that is at 894, volume 4, but it's 12 minutes on the tape. Okay, and what specifically? Again, without a transcript, it's somewhat difficult to- And I apologize, Your Honor. I understand that. Wait, but what does he say in 12 minutes? And state it as best you can, not rephrasing it. Sure. What were the words he used? I worked. Well, I'm going to jump in, because I wrote this down when I was listening to the tape. There is one point, Mr. Adams says you worked at his ranch, too. Mr. Pogue, I did a lot. No, he actually says work. It's really because Thayer was talking on top of it. I may have misheard that, but that's why I wrote it down. We can listen to it some more. We're going to have to listen to it. But then, right after that, there's this other exchange that says you lived there, but you never, you never worked. I didn't. So what are we supposed to do with that? Well, one, I'd ask the court to listen to the tape in the context of how the questions are being asked. Because I truly believe that also Pogue, he was no longer a student athlete, but he's a fairly bright individual, but he was being intimidated by this so-called reporter. And the reporter's trying to put words into his mouth, and he's trying to create the impression of saying that, well, we know that John Talley paid student athletes to work, and they didn't have to do anything, or they did sham jobs, or he overpaid them. And so he's throwing these allegations, he's making these statements to also Pogue, trying to get him to agree with them. And that's where also I was kicking back and saying, no, I didn't do any of that. You know, he lived at John Talley's place. Well, you said he didn't get paid, right, for speaking other than gas money. Right. Right. You didn't get, exactly right. He didn't get paid for speaking. Other than gas money. He got reimbursed for speaking. Other than gas money. But, Your Honor, you know, the speaking, it's taking this information and putting it out of context. The speaking engagements before 2000, there was no issue, no problem with John Talley paying athletes or students. Because, I mean, John Talley's working for FCA, this is actually FCA. It's not John Talley. And so FCA is sending these kids to do speaking engagements, and before 2000, there was no issue with that. 2000, the NCA came in and said, hey, you know, you can't pay him for speaking engagements. So what he started doing is team building activities. And they'd go out and do activities with kids, and then after the activity, they would give a lecture to the kids, or they'd communicate with the kids. And so he could pay him for that because there was a physical activity. And then the other activities would be, That was going to be one of my questions. So there's team building on the one hand, and there's speaking engagements on the other hand. Those are two different things. Those are two different things, Your Honor. And it was okay to get paid for team building. Yes, sir. And then also, it was okay if they came out and worked. And that's consistent with John Talley's mission because he believes that if he brings these kids out there, not just the football players, it's the softball players, the baseball players, but it's also the regular students as well. If they come out and they work, and they cut down trees, or they dig post holes and put up fence, or they go and help someone move, or they go help because there's been tornado damage and they help repair homes or whatever, and they go out and work side by side, he gives him an opportunity to be able to learn about these kids and to know these kids. And that's what he's doing. This gentleman makes less than... How many people are working on this space at any one time? It's only four and a half acres, right? No, no. It's not just his property, your honor. It's other people in the community. There's other people, like if there's a tornado that went through a joining community in Stillwater, then they would go out and help fix those homes. Or they'd go out and fix someone else's yard or cut down trees. So it wasn't just work on this little bitty four and a half acres? Correct, your honor. Okay. That's pretty small for a ranch. It is real small for a ranch. In fact, when this NCA went out and looked at it, they laughed. And so, you know, we have a situation where this article has gone down in the history of media as being one of the worst vetted articles ever. And we have an expert, Chris Harper. They filed a divert motion. The judge denied it. And in his report, he says that they acted reckless. So our argument is, one, that they published a false fact about also a pole guy. But two, they acted reckless in reference to all these other allegations. But fundamentally below that is that there is a question, a fact, as it relates to these issues. And these issues need to be addressed by the proper trier of the fact, the jury. And by the court addressing these questions, took it out of the hands of the jury, denied my client, John Talley, the right to have a jury trial. The expert what were you saying? Chris Harper. He's a professor from Temple University. And he's testified that one of the big concepts in this case is confirmation bias. That media outlet has a story and they only ask the information to confirm their bias. They disregard all the others. They are testified that he interviewed over 60 athletes. But yet they only had two athletes that said that John Talley either paid for a sham job or overpaid him. And both athletes, Faith Carter, he lied twice to Sports Illustrated about, one, graduating from OSU with a double degree and he did not. And two, taking a course with Tatum Bell, who went on to try to play in the pros. And they flunked out because the football season was over with. They were no longer getting preferential treatment. And so they flunked out. But the reality is they dropped the class before they flunked because Tatum Bell went to the NFL. And then Brad Gartman got kicked out because he was doing drugs. So these are the credibility sources that they're relying upon to place my client, John Talley, in a false light. So tell us about this expert. Did the court not consider the expert report? Was that? Your Honor, we submitted it. It's in the record. It's 822 through 826, Volume 4. Was it part of the summary judgment proceeding? Yes, Your Honor. But you said something about Daubert. Well, yeah, there was a Daubert motion initially and the court denied the Daubert motion as to Chris Harper. So the Chris Harper report is part of our review? Yes, Your Honor. All right. Let's talk a little law here. You've got a false light invasion, a privacy claim, and you're arguing on appeal that the court erred on the false light element and then also on the actual malice, reckless disregard element. Both of those, correct? Yes, Your Honor. Okay, so far. All right. Tell us, maybe going back to Osso Poggi, or if you want to pick another example, that's okay too, but what's your strongest case for actual malice here that the reporters, editors, et cetera, either knew or had a serious doubt about the truth of the article? Well, in reference to Osso Poggi, the actual malice, and I wish there was a bright line rule as far as defining what it is, but the courts have clearly made it so that it needs to be a case-by-case basis, and probably that's the way it should be. But actual malice, as you know, is either one, they knew the fact was false, or two, they acted in such a reckless manner in publishing information that was false. In reference to Poggi, they actually knew the facts were false. One, if you take the testimony of John Talley, that's true, for purposes of summary judgment, he sets forth the agreement, the understanding that existed as it relates to Osso Poggi. There's nothing wrong with a student athlete to spend time and live with a good friend. There's no violation. The underlying premise of this case is that John Talley did all these things in violation of the NCAA rules or the rules of Oklahoma State University. Well, the article just says that he and another player lived at the ranch one summer rent-free. What's false about that? I mean, he didn't pay him any money. He didn't pay him any money, but he had to earn his keep. He had to work for it, so he didn't get it free. He had just a different means of tendering. Instead of paying for it, he worked there to live. But it's in context of that statement of rent-free. But in the interview, Evans asked him, he didn't charge you rent, obviously, Mr. Poggi. No, he didn't charge his rent. And the article says he lived there rent-free. Why isn't that a reasonable interpretation of that exchange? Because when you go on to the article, it says, because I was the quarterback and that was a big deal. So they're creating the impression that he lived there rent-free because he was a big-time quarterback at OSU. But he still lived there rent-free, right? In reality, he lived there without having to pay rent, but he had to work for his rent. Plus, he was best friends with Saul Talley. Well, we've already gone over the work. Sure. Okay. Anything else on actual malice besides that? Your Honor, the other argument would be that based upon the confirmation bias set forth by Chris Harper, that they did not determine the credibility of their resources, their sources, in reporting either the sham jobs or overpayment of jobs. And because of that, that would be the recklessness that we'd argue that creates a question of fact that should be permitted or should be submitted to the appropriate trier effect. Could I just follow up? You gave an answer to Judge Murphy when he asked you about an agenda, and you said it didn't matter. But I understood your brief to argue that an agenda did matter, that the reporters had an agenda. They had a narrative or something along those lines. And what I'm interested in your addressing is how that might relate to your actual malice argument. And maybe I simplified it and overstated what I meant. What I was trying to say is that Thera Evans can ask whatever questions he wants to, however he wants to. But when you look at the way he went about doing it and asking the questions, he's really not asking to find out the truth of the circumstance, but he's asking those questions in such a way to fulfill whatever agenda he wants to. So if he knows that facts are false and he goes ahead and asks those questions to support his agenda, then that could be recklessness. Thank you, Your Honor. I'm out of time. Are you out of time? Oh, he's over time. Oh, you're over time. Okay, you're over time. Sorry, Your Honor. I think you need to sit down. Well, thank you very much. Thank you. May it please the Court, Robert D. Nealon, on behalf of Time, Inc. and the individual appellees. The issue in this false-like case is whether the plaintiff, John Talley, demonstrated to the district court with specific evidence that there were genuine issues of material fact regarding each element of his claim. The court below determined that he did not and granted summary judgment. In applying a de novo standard review, the judgment should be affirmed, because Talley failed to demonstrate that the two statements about which he complains are materially false, and he failed to demonstrate clearly and convincingly that the Sports Illustrated article, which accurately reported recorded conversations with multiple sources and also reported Talley's version of the fact, was published with actual malice. Talley's claim arises out of a five-part article, about 19,000 words, published in Sports Illustrated in September 2013. The article focused on the Oklahoma State football program, primarily during and immediately after the time that Coach Les Miles arrived, beginning in 2001. The first part of the article, roughly 5,000 words, was about the role of money. The gist of the money part of the article was that OSU fostered or encouraged, permitted, turned a blind eye to payments to players. Money slipped to them by coaches or boosters in the locker room or on the team bus, prepaid credit cards, sham jobs offered by boosters like Kay Norris. Talley is mentioned only in a 442-word passage in that first part about money. The gist of this passage about Talley was his generosity. That word is used twice in that passage. His generosity toward OSU players, some who were teammates of his son, Saul, who was a walk-on long snapper in 2002. He showed that generosity by providing work for them on his ranch or whatever we want to call his property and elsewhere and setting up speaking engagements through his position with FCA. On appeal, Talley contends there are two false statements that placed him in a false light. There are a couple of sentences about us at Po'Guy, the quarterback, when Coach Miles arrived. Po'Guy, as we've been discussing, lived at his ranch during the summer to rent free. The second area was a segment about Talley's paying student athletes for speaking engagements. Those are the two alleged falsities as the case has evolved to this point. What evidence did the record in this case contain? I can't possibly spend enough time enumerating everything that's in the record because it was extensive. The defendant submitted relevant excerpts of audio recording of Evans' interview of Po'Guy, Evans' notes about that interview, and his affidavit about his conversation with Po'Guy. There's Schechter's deposition testimony in his affidavit about his interview of Talley and their email exchange about Po'Guy. In the defendant's summary judgment motion that Judge Matheson quoted a minute ago, we quoted the pertinent part of the recording of the Po'Guy interview that indisputably supports what the article said. Well, that's where I want to jump in. It does seem that there was one exchange between Mr. Evans and Mr. Po'Guy that I'm interested in your response to. Again, I tried to write it down as best I could, and I'll go back and check, and we can all go back and check. But it seemed to me that it said this. Mr. Evans asked, you worked at his ranch, too. And Mr. Po'Guy responded, I did a lot. Now, why doesn't that indicate that Mr. Po'Guy was working at his ranch? Judge, in retrospect, I wish we had not included that because if you listen to the whole tape, Evans and Mr. Allwood was correct. They're talking back and forth, and if you listen carefully to the tape, Evans and Po'Guy have been talking about speaking engagements, and Po'Guy did a lot of speaking engagements at Talley's request. And Po'Guy said he was never paid for those, he just got gas money. And the article doesn't say Po'Guy was paid for speaking engagements. But Evans and Po'Guy are talking about speaking engagements, and Po'Guy finishes a thought saying I did, I did a lot in reference to speaking engagements. Evans starts another question. Wait a minute, it said worked at his ranch. And that's Evans starting to ask a new question about working at the ranch. And if you listen to the tape. Okay, so what you're saying is that when Mr. Po'Guy said I did a lot, you understand that to be in reference to the speaking engagements. He's finishing a thought about speaking engagements. Evans has already moved on to talking about work at the ranch, and they're talking over each other. So working a lot are words of Evans, not words of Po'Guy? No, a lot are the words of Po'Guy, but in reference to speaking engagements. He was finishing his thought about speaking engagements. But the way Judge Matheson heard it, the word working was in there too, and it was stated by Po'Guy. Well, I think if you listen, then Evans asks about working at the ranch, and then they shift their conversation to working at the ranch. Is confusion enough to raise a genuine issue of material fact? No, and I'll explain in a minute why it's not a material fact, even if there is some dispute, because we reported Talley's version of what their non-arrangement was. Why don't we get to that now? Because I guess it's kind of a two-part question in my view. Is it a genuine issue of material fact as to the falsity element of the claim, and or is it a genuine issue of material fact as to the actual malice element? Yes, and our argument is it does not create a genuine issue of material fact with regard to either element. I thought that's what you might say. Yes, because it's not material, and again you can go back to this court's very in-depth analysis of material falsity in the Broker's Choice case, the Bustos case. You can look at Judge Ives' dissenting opinion in the Colorado Supreme Court in Erie, Wisconsin that was echoed in the U.S. Supreme Court's decision in that case talking about what is material falsity, and if there's a little bit of disagreement there, there was no arrangement. He lived there rent-free, as the court has pointed out. There was no arrangement about it. Pogueye and Talley even giving the benefit to this interpretation that he said, I did some work. It's not clear what work he did. It's not in the record. Did he make his bed? Did he fix dinner? Did he wash the dishes? Maybe even he baled hay. But does it make any difference in terms of material falsity because the fact remains he lived there rent-free, and that was a benefit that he got that other student athletes or other students at OSU did not get. Whatever that may mean in terms of this overall context of how OSU was using incentives of one kind or another to get premier athletes to come and play football at that university. So in the context, if you look at the gist of the passage about money, you can almost do it in a concentric circle. What's the gist of the whole five-part article? You can narrow it down to what's the gist of the money part, or you can narrow it down even further to the gist of the part about Talley. But in each of those, no matter how broad or narrow the circle is, you're looking at what's the gist of being said. And in terms of what's being said about Talley and Pogai, he lived there rent-free, which was a benefit other students didn't get. Pogai and Talley have different views about how much work he had to do, and it's not defined in the article. It's not defined in the record. And it just doesn't make any difference in terms of the overall context of the passage about Talley. Whether he did a little bit of work or didn't do a little bit of work, Talley didn't calculate the value of that work and say, okay, that's a substitute for paying rent. You're working for your keep here. Pogai lived there because, as Mr. Allred pointed out, he was a friend of Talley's son, Saul. That's why he was there. And he was given a benefit that other students did not get. And certainly with regard to actual malice. Even if there were hypothetically a genuine issue, a material fact about working or not working on Talley's property, there's no evidence from which a jury could conclude clearly and convincingly that Time Inc. and its reporters believed that what they were writing in the article was substantially false. And the two tend to be interconnected because the closer the question is about material falsity, the harder it is to make a case that there's actual malice when you just have a different viewpoint. And, again, the article pointed out what Pogai said. They pointed out the fact that Talley had a different view of that. In Talley's view, Pogai did have to work. In Pogai's view, no, he didn't have to. He was Saul's friend, and he lived there rent-free. You don't have to resolve that fact dispute to get to the gist of the passage about Talley and Pogai that he lived there rent-free. And that's the gist of what was being reported. And Pogai says, on reflection, it was a big deal. And Pogai volunteered that information to Evans. Looking back on it, it probably was a big deal because I was the starting quarterback. Could I just ask you about the paying football players to give speeches? Mm-hmm. Did any of the players, or Mr. Talley, say specifically that payment was for anything more than for reimbursement for mileage and expenses? Yes. There were several players. We have the recorded interviews, and they're in the record, that said they were paid for speaking. And they never differentiated between being paid for speaking as opposed to getting gas money. And we have in the record the interview of Sean Lewis when the NCAA came in later, and he said, No, I was paid for speaking. I didn't even have a car. And this is after the NCAA rule prohibited that? We don't know. There's nothing in the record exactly what NCAA rules are or were or to what degree they may have changed during the time. Implicitly, paying for speaking engagements must have been against the rule because the OSU compliance office warned Talley that he couldn't do it. But there's nothing in the record specifically about what the rule is. And Mr. Talley has always contended, Well, it's okay to pay for team building, although it's hard to differentiate between what's really team building and speaking. But Mr. Talley claimed that he could pay for team building. He couldn't pay for speaking engagements. But there's nothing in the record that would justify that statement that he could pay for team building. That was his view, and he did it. And again, in terms of material falsity or actual malice, either one. You just can't differentiate. It's not a material difference to say, paid for speaking to students, or you can't pay for speaking to students, but you can pay for team building, which is a physical exercise before you speak to students. One of Mr. Talley's arguments is that there were football players who were sources for this article who had a history of drug use, crime, and academic misconduct. Why wouldn't that provide some evidence, or at least the beginning of some evidence, to make out an actual malice case? Well, as Judge Sack has said, sources don't have to be paragons of virtue to be safely relied on by journalists. And oftentimes when journalists are doing investigative reports, the sources they have to rely on are not ones who have. Do you have any case, though, that is like this, where there's been a defamation or invasion of privacy claim made, and the argument is that the reporters really shouldn't have been believing some of these sources because of their backgrounds, and just the way a court has dealt with that. We cited a number of them in our appeal brief. There were seven or eight cases we cited. I think the McFarland case. I'm sorry, I don't remember what page it was of our brief, but there are a number of cases in there that say that that's not evidence of actual malice, and especially so when, regardless of their background or their virtue or lack of virtue, when they are relating their personal experiences and accurately reported as evidenced by the recordings and interviewed independently, they tend to corroborate each other because they had similar experiences. Even though they all may have been druggies in terms of getting money in socks or being paid for speaking engagements, whatever it happens to be, they corroborated each other in terms of the accuracy of that. By the way, you argue a lot in your brief about the article accurately reporting what the football players said in the interviews, but I'm wondering how far that really takes you. You're not arguing that that would immunize the article from liability in and of itself. In this case, yes, because we report what the players say, we report the view of others. Let me give you an extreme example, then. What if the football players had said something about Mr. Talley to the effect that he was a serial murderer? And that's in the interview, and the reporter takes it and puts it in the article, but there's no basis to it, but they've accurately reported what was said in the interview. In that isolated instance, I would agree. That would not immunize Time 8. I'm just concerned with the argument that the mere accurate repeating of what was said is enough, and that can't be the law. Not in that most literal sense, but in the sense that in the context of a particular publication, that can be substantial truth, and the Campbell and Green cases talk about that. Well, it's better than ignoring what was in the interview. I'll grant you that, but if it were a false and defamatory statement and it's put in the article, even though it's accurately reported, couldn't there still be a possible claim against something like that? Well, again, you have to look at the specific words and the context in which they're used. Well, I said false and defamatory. We're going to take that as an assumption. But even if it's false and defamatory, if the context of the article is not that this is fact, but the fact being reported is the accusation was made and somebody over here has denied the accusation, and the fact that the accusation and denial are made is itself what is being reported, and that's the situation in this case. All these factors that led to OSU's remarkable meteoric rise in the football world, what role they played, how all this came together is virtually unknowable. These are simply looking at factors that may have had an influence on how the OSU program got to where it got, and money happened to be one of those things. You just hit the exact time that he did, so I think, sir, you're ready to conclude. Thank you, Judge. Okay, thank you very much. We appreciate both of your arguments this morning. The case will be submitted and counsel are excused.